COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Humphreys, Beales, Huff, O'Brien, AtLee, Malveaux,
            Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Raphael, Lorish, Callins and White
Argued at Richmond, Virginia

**PUBLISHED**

TERESA MARY MAUST

                                                OPINION BY
v.      Record No. 0505-21-4              JUDGE MARY BENNETT MALVEAUX
                                               MAY 30, 2023

COMMONWEALTH OF VIRGINIA

UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
J. Bruce Strickland, Judge[1]

Andrew J. Cornick (Andrew J. Cornick, LLC, on brief), for
appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Teresa Mary Maust ("appellant") appeals her conviction for distribution of a Schedule I or II

controlled substance, in violation of Code § 18.2-248. Before a panel of this Court, appellant

argued that the trial court erred in finding that the evidence was sufficient to prove that she

distributed oxymorphone because no rational trier of fact could have concluded that the evidence

reasonably excluded her theory of innocence. A panel majority of this Court reversed appellant's

conviction. *Maust v. Commonwealth*, No. 0505-21-4 (Va. Ct. App. Aug. 9, 2022). We granted the

Commonwealth's petition for rehearing en banc and stayed the mandate of the panel's decision.

Upon rehearing en banc, we affirm the trial court.

---

[1] Judge J. Bruce Strickland entered the final sentencing order in this case. Judge Charles
S. Sharp presided over appellant's trial and entered the conviction order.

I. BACKGROUND

"[W]e review factfinding with the highest degree of appellate deference."
*Commonwealth v. Barney*, ___ Va. ___, ___ (Mar. 16, 2023) (quoting *Bowman v. Commonwealth*, 290 Va. 492, 496 (2015)). "In accordance with established principles of appellate review for a sufficiency of the evidence case, we view the 'evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court.'" *Peters v. Commonwealth*, 72 Va. App. 378, 383 (2020) (quoting *Riner v. Commonwealth*, 268 Va. 296, 330 (2004)). Therefore, we will "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

On October 1, 2018, Stafford County Detective Shawn Monaghan used a confidential informant, Robert Gale, to conduct a controlled buy of three oxymorphone pills from appellant. Monaghan searched Gale and his car at a staging area before the controlled buy, finding neither drugs nor money. Monaghan "directed" Gale to go to appellant's residence to buy the pills. Monaghan expected each pill to cost about $100 and understood that Gale owed appellant some money, so he provided Gale with $320 in cash. Monaghan photographed the cash to record the serial numbers and denominations. He also equipped Gale with an audio-only recording device, which did not permit Monaghan to listen in real time.

At trial, Monaghan testified that he did not recall Gale's girlfriend, Tiffany Love, accompanying Gale on October 1, 2018, but an unidentified woman can be heard on the audio recording speaking with Gale during the drive to and from appellant's house. A few minutes before Gale arrived at the house, Gale told his companion, "Text her and say here." While the entire conversation between Gale and the woman cannot be heard clearly on the audio recording,

no audible conversation indicates that Gale gave money to his companion or received pills from her.

Monaghan followed Gale's car to appellant's street but lost sight of it after Gale entered appellant's driveway. Other cars were in the driveway, but Monaghan did not recall whether there were other vehicles in the home's garage.

The audio device recorded Gale entering appellant's house and exchanging greetings with appellant.[2] They then discussed some "new" kitchen appliances that appellant claimed were worth over $3,000 and wanted to sell for $1,000. Gale gave appellant $270, which she verbally acknowledged receiving. After discussing the kitchen appliances again, appellant said, "Give me a second," and Gale responded, "Okay. Alright. I'll be outside." Gale left the house to wait; appellant followed two minutes later, and they again spoke about the appliances before Gale left. Gale was in appellant's home for about ten minutes.

The audio recording from inside appellant's home is inaudible at certain points. The only audible conversation was between Gale and appellant, although Monaghan acknowledged at trial that an unidentified woman's voice could also be heard on the portion of the audio recording from inside the house. At one point during this portion of the audio recording, Gale and the unidentified woman seem to exchange greetings, but he did not have any additional conversation with her. Appellant testified at trial that she could hear the voice of Sue Stone, a woman who lived with her, on the audio recording.

Gale drove back to the staging area with Monaghan following him. Gale's companion was recorded speaking with him during this drive, and the recording includes no audible conversation about exchanging money or pills. Monaghan retrieved the recording device,

---

[2] At trial, Monaghan identified appellant's voice on the recording based on his face-to-face interview with appellant.

searched Gale and his vehicle, and confirmed that Gale no longer had the buy money, although he did have $16 in cash. Monaghan also found three pills on Gale's person that subsequent lab analysis determined were oxymorphone, a Schedule II controlled drug.

Gale died before trial. Monaghan testified at trial that Gale had been an opioid addict and that he had been convicted of multiple felonies.

Monaghan searched appellant's house the day after the controlled buy, finding "numerous pills," "pill crushers," a "pill press," "numerous prescription bottles for different narcotics, the majority of which were empty," and a "large amount" of currency. In appellant's bedroom, police found $138 and an additional $4,351 in a safe.[3] Among the contents of the safe, Monaghan identified $270 of the $320 he had provided Gale to make the controlled buy.

The cash in the safe was in an envelope that had handwritten notations which Monaghan described as indicating "pills or . . . money," and columns of numbers he described as "totals."[4] Monaghan characterized this envelope as an "owe sheet[]," which he explained was used by drug dealers "to keep track of drugs that they front or give to people on credit."

While the search was underway, appellant arrived and was interviewed by Monaghan. When confronted by Monaghan about pill sales at her home, she first told Monaghan that her ex-husband stole her prescription pills, which she had for a "legitimate prescription," and any drug sales conducted at the house should be attributed to him. Appellant said that she purchased the safe to keep her pills away from her ex-husband and that she only began using the safe to

_____

[3] Appellant provided Monaghan the combination to the safe.

[4] The first set of notations, a column, are as follows: "B = 11[,] G = 17[,] J = 121[,] H = 25[,] L = 19." The second set of notations, also a column, is partially concealed on the Commonwealth's exhibit, but the notations that can be read are "850 2450 250 95," all above a line, and then the number "4710" below the line. A third set, another column, have the numbers "1210 1210" above a line, with "2420" below the line, and then "419" and "5" above another line with "95" below that line.

- 4 -

store money once her ex-husband moved out of the house. In addition to her ex-husband, appellant also stated that a woman named Briana Perry was responsible for any pill sales at her house.

When Monaghan told appellant that two of her pills were found on Sue, she claimed that she gave them to Sue to "hold on to for [appellant]," although she later admitted that she gave the pills to Sue to use, but only because Sue had the same prescription as appellant. She also said that she sometimes lent pills to other people but again denied selling them. While looking at appellant's phone, Monaghan told appellant that "Greg Murphy is talking to you about getting pills," which appellant denied. She then admitted that she sometimes allowed Murphy to borrow pills.

According to Monaghan, during the interview appellant "surmised" that Gale was the confidential informant and then told him that any money she took from Gale was for a debt Gale owed to her. Regarding Gale, appellant told Monaghan that he "comes to me when he runs out," and "sells more than I do."

Appellant also told Monaghan that her safe contained around $4,500 and that she had withdrawn the money from her bank so she could find a new place to live because her house was in foreclosure. She said she had withdrawn the money in stages—writing "a $2,000 check not too long ago," "tak[ing] out $600 in cash, $300 in cash" at a time, and "socking it to the side." Appellant stated that the buy money found in her safe was payment of Gale's debt to her, which she said was "a $100 and something dollars."

Appellant told Monaghan that her two sons and Sue were the only other persons living in the house at the time of the search.

At the close of the Commonwealth's case-in-chief, appellant moved to strike the evidence, which the court denied. Thomas Hogan then testified in appellant's defense, stating

that he had been one of nine or ten tenants staying at appellant's house in October 2018. Hogan stated that he had collected the rent from the other tenants on the first of each month and then gave it to appellant. Hogan said he paid $600 in rent, but others "sometimes" paid less. He claimed that Gale came to appellant's house to look at appliances, although Hogan acknowledged that he was not present when Gale was at the house on October 1, 2018. Hogan did not know the combination to appellant's safe.

Appellant testified that Gale came to her house to look at appliances and to make a down payment on a compressor and nail gun. She stated that Gale owed her $100 or $150 and that on the day of the controlled buy, Gale paid her what he owed plus another $100 or $150 for the down payment. As for the owe sheet, appellant claimed that she used a system to track her money in which she "put down eleven for Benjamin," "G, a George Washington, J, Jefferson, Hamilton"; she could not remember what the "L" stood for, although with prompting from her counsel said that it probably stood for "Lincoln," a "five dollar bill." She testified that she had rented rooms in her home, charging between $300 and $600 per month.

After argument by counsel, the trial court convicted appellant of distribution of a Schedule I or II controlled substance. In its ruling, the trial court found that: (1) Gale was given buy money and was searched before making the controlled buy, and no contraband was found on him; (2) Gale was in appellant's home for approximately ten minutes, and the only substantive conversation that could be clearly heard on the audio recording during that time was between Gale and appellant, and that "[i]n the course of that relatively garbled transmission, one thing is clear, that at some point there was an exchange of cash money"; (3) Gale then left appellant's house, and Monaghan again searched him and found three oxymorphone pills and no buy money; and (4) the buy money was found in appellant's safe during a search and that any person other than appellant had "limited access" to the safe. The court found that the "only reasonable

inference to be drawn from that set of circumstances is that the transaction went down exactly as has been argued by the Commonwealth."

## II. ANALYSIS

Appellant argues that the trial court erred in finding the evidence sufficient to support her conviction for distributing a Schedule I or II controlled substance because the evidence was circumstantial and failed to exclude all reasonable hypotheses of innocence.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)). In addition, "[t]he judgment of the trial court, sitting without a jury, is 'entitled to the same weight as a jury verdict.'" *Perkins*, 295 Va. at 327 (quoting *Cole v. Commonwealth*, 294 Va. 342, 361 (2017)).

Appellant argues that a reasonable hypothesis of innocence exists—that Gale used the buy money to repay a debt to her and that he obtained the three pills from someone other than

- 7 -

her.  Appellant points to the presence of a woman in the car with Gale on the drive to and from her house[5] and to the voice of a woman other than her in the house with Gale.

"Where a controlled purchase of drugs is concerned, 'without [the informant's] testimony, the evidence proving that the [drugs] came from the defendant' may be 'purely circumstantial.'"  *Bennett v. Commonwealth*, 69 Va. App. 475, 492 (2018) (alterations in original) (quoting *Jones v. Commonwealth*, 21 Va. App. 435, 441-42 (1995) (en banc)).  "Circumstantial evidence, if sufficiently convincing, is as competent and entitled to the same weight as direct testimony."  *McCain v. Commonwealth*, 261 Va. 483, 493 (2001).  But "when the evidence is wholly circumstantial . . . all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence."  *Haas v. Commonwealth*, 299 Va. 465, 468 (2021) (quoting *Rogers v. Commonwealth*, 242 Va. 307, 317 (1991)).  "This requires an unbroken evidentiary chain of necessary circumstances, which satisfies 'the guarded judgment that both the corpus delicti and the criminal agency of the accused have been proved to the exclusion of any other rational hypothesis and to a moral certainty.'"  *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (quoting *Wright v. Commonwealth*, 292 Va. 386, 397 (2016)).  The "reasonable-hypothesis principle," however, "is not a discrete rule unto itself" and "does not add to the burden of proof placed upon the Commonwealth in a criminal case."  *Vasquez*, 291 Va. at 249-50 (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)).  "The Commonwealth . . . is not required to exclude every possibility that others may have committed the crime for which a defendant is

---

[5] In appellant's motion to strike and closing arguments, she contended only that the evidence was insufficient due to the presence of other voices in the house and did not mention the presence of the woman in the car with Gale.  "[U]pon appellate review, the issue of exclusion of reasonable theories of innocence is limited to those theories advanced by the accused at trial."  *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003).  However, on appeal in this case, the Commonwealth has not argued before the panel of this Court or en banc that appellant's contention regarding the woman in the car is waived under Rule 5A:18.

charged, but is only required to exclude hypotheses of innocence that flow from the evidence." *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000). Thus, the reasonable-hypothesis principle "is 'simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt.'" *Moseley*, 293 Va. at 464 (quoting *Hudson*, 265 Va. at 513). "It is true that a factfinder cannot 'arbitrarily' choose, as between two equally plausible interpretations of a fact, one that incriminates the defendant." *Vasquez*, 291 Va. at 250 (quoting *Dixon v. Commonwealth*, 162 Va. 798, 803 (1934)). An arbitrary choice occurs "only when no rational factfinder could believe the incriminating interpretation of the evidence and disbelieve the exculpatory one." *Id.*

On appeal, in reviewing a defendant's claim that a trial court unreasonably rejected her hypothesis of innocence, we are mindful that "[w]hether an alternate hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on [this Court] unless plainly wrong." *Wood v. Commonwealth*, 57 Va. App. 286, 306 (2010) (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). "As long as 'a rational factfinder could reasonably reject [the appellant's] theories in his defense and find that the totality of the suspicious circumstances proved [his guilt] beyond a reasonable doubt,' the appellate court must affirm the conviction." *Park v. Commonwealth*, 74 Va. App. 635, 654 (2022) (alterations in original) (quoting *Moseley*, 293 Va. at 466). "[M]erely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (second and third alterations in original) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)).

Here, we conclude that the trial court did not err in rejecting appellant's alternate hypothesis of innocence that Gale obtained three oxymorphone pills on the date of the offense

from someone other than appellant. The Commonwealth's evidence, viewed in the light most favorable to it, demonstrated that Gale went to appellant's residence with the buy money that Detective Monaghan provided and with the intention of buying oxymorphone pills from appellant. After arriving, Gale gave the money to appellant and returned to Monaghan ten minutes later with three oxymorphone pills. Although Monaghan did not witness the transaction, the audio recording demonstrated that Gale interacted with appellant and that she verbally confirmed that Gale gave her money. While another person was with Gale on his drive to and from appellant's house, and another woman could be heard on the audio recorded inside appellant's home, there was no recorded conversation between these individuals and Gale indicating that he exchanged money or pills with them. Moreover, Monaghan followed Gale to and from appellant's house and searched him before and after the transaction.

Further, during a search of appellant's house, police found "numerous pills," "pill crushers," a "pill press," "numerous prescription bottles for different narcotics, the majority of which were empty," and a "large amount" of currency. Police found $4,351 in a safe in appellant's bedroom, including $270 of the buy money given to Gale. *See Burrell v. Commonwealth*, 58 Va. App. 417, 434 (2011) ("[T]he fact-finder may consider such factors as . . . the presence of equipment or other items related to drug distribution."); *White v. Commonwealth*, 24 Va. App. 446, 453 (1997) ("Considered with other factors, possession of currency by a defendant may be considered in determining whether he or she possessed drugs with an intent to distribute."). Monaghan also described the envelope containing the cash as an "owe sheet[]," an item used by drug dealers "to keep track of drugs that they front or give to people on credit."

In addition, in her interview with Monaghan and at trial, appellant provided inconsistent statements as to the presence of the cash in her safe and whether she distributed pills to others.

At trial, appellant testified that Gale repaid a debt he owed her and made a down payment on certain tools. She also testified that she had been receiving rent from people living with her. That testimony, however, was contradicted by appellant's statements to Monaghan the day after the controlled buy, when she did not mention rental income or Gale making a down payment on tools. Appellant also told Monaghan that only four people lived in the house—herself, her two sons, and a woman named Sue.

Moreover, although appellant repeatedly denied that she sold any pills, she implied the opposite by stating that Gale "comes to me when he runs out" and that he "sells more than I do." When Monaghan told appellant that two of her pills were found on Sue, appellant first claimed that she only gave the pills to Sue so that Sue could give them back later when appellant needed them. She then admitted that she gave pills to Sue for Sue's own use but claimed that she did so only because Sue had a prescription for the same pills.

It is well-established that "[d]etermining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). Moreover, "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018). "When 'credibility issues have been resolved by the [fact finder] in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991)). Here, the record demonstrates that appellant provided vague, inconsistent, and contradictory explanations for the presence of the cash in her safe and as to whether she distributed pills to others. "[A] fact-finder, having rejected a

- 11 -

defendant's attempted explanation as untrue, may draw the reasonable inference that his explanation was made falsely in an effort to conceal his guilt." *Covil v. Commonwealth*, 268 Va. 692, 696 (2004).

Based on the evidence above—including Monaghan's search of Gale before and after the controlled buy and his receipt of the pills from Gale; the audio recording reflecting the exchange of money between Gale and appellant; the buy money found in appellant's safe; the items indicative of drug distribution found in appellant's home; and appellant's inconsistent statements and statements indicating that she distributed drugs—it is clear the trial court was not plainly wrong in concluding that the evidence was sufficient to support appellant's conviction.

Appellant urges us on appeal to discount this evidence and instead focus on the presence of individuals other than appellant and Gale during the controlled buy. In support of her argument that the trial court unreasonably rejected her alternate hypothesis of innocence that the woman in the car with Gale or the other woman in the house supplied Gale with the pills, appellant cites to two decisions of this Court, *Jones*, 21 Va. App. 435, and *Bennett*, 69 Va. App. 475. Yet, a review of these cases demonstrates that, contrary to appellant's argument, they in fact support the conclusion that the circumstantial evidence in this case was sufficient to support appellant's conviction. In both cases, confidential informants involved in controlled buys of drugs did not testify at trial. *Jones*, 21 Va. App. at 441-42; *Bennett*, 69 Va. App. at 479. Nonetheless, our Court affirmed both drug distribution convictions based on the other circumstantial evidence presented at trial. *Jones*, 21 Va. App. at 444; *Bennett*, 69 Va. App. at 495.

In *Jones*, police searched the confidential informant, provided him with buy money for a controlled buy, and then drove him to an unspecified location near a restaurant where the transaction was to occur. 21 Va. App. at 438. Police lost sight of the confidential informant

until he walked through an alley into the restaurant's parking lot. *Id.* at 438-39. They saw the confidential informant and the defendant meet in the lot, but lost sight of both of them when they "momentarily" walked in front of the restaurant. *Id.* at 439. During this time, police could not see whether the confidential informant "went into the restaurant or met other persons." *Id.* There were also "other restaurant patrons . . . in the area" at the time. *Id.* After leaving the front of the restaurant, the confidential informant and the defendant were seen entering the defendant's car, and the confidential informant left the car after a "short time." *Id.* Police saw the confidential informant walk toward where he was to meet other police officers, but did not see the meeting. *Id.* Police did not see an exchange of money or drugs between the defendant and the confidential informant. *Id.* at 438-39. Our Court affirmed the defendant's conviction, noting that the evidence established that before meeting with the defendant, the confidential informant did not possess any drugs and had $2,500 in currency and that after meeting with the defendant "for the purpose of purchasing drugs," the confidential informant no longer had the $2,500 but did possess two ounces of cocaine. *Id.* at 444. We held that "[t]he fact that the officers did not have [the confidential informant] under surveillance the entire time he was away from [the officers] does not establish a reasonable hypothesis that someone other than [the defendant] was the source of the cocaine." *Id.*

In *Bennett*, police used a "live" audio feed to monitor the controlled buy and made and reviewed additional audio and video recordings of the transaction. 69 Va. App. at 480. The confidential informant called the defendant, and during this call mentioned slang terms for tobacco cigarettes dipped in PCP and crack cocaine. *Id.* at 480-81. After this call, and a subsequent call during which the defendant told the confidential informant where to meet him, police observed the informant until he entered an apartment complex. *Id.* at 481. After the confidential informant was out of sight, police heard the informant's and the defendant's voices

on the live audio feed, as well as other unidentified voices. *Id.* The video recording showed the confidential informant encountering two different people inside the residence—a woman who was "fleetingly" visible in the living room at the beginning of the video, and the defendant who was visible during the remainder of the video. *Id.* at 482. The video showed the defendant holding a plastic sandwich bag and two slightly discolored cigarettes. *Id.* Affirming the trial court's conviction, our Court noted that "investigators searched the informant before and after the transaction, monitored his movements throughout the relevant period of time, and kept him in view except for the period during which he met the [defendant]." *Id.* at 494-95.

These decisions provide the holding, relevant here, that lapses in police surveillance or the presence of other individuals during controlled buys do not render the evidence insufficient when the confidential informant fails to testify at trial. Instead, as in all circumstantial evidence cases, the determination of whether an alternative hypothesis of innocence is reasonable is one made by the fact finder below upon consideration of the totality of the circumstances and is one that we do not disturb on appeal unless plainly wrong. *Wood*, 57 Va. App. at 306. Accordingly, we conclude, as in *Jones* and *Bennett*, that the fact that Gale was not under surveillance during the entirety of the controlled buy and that other individuals were present during the buy did not make the trial court's rejection of her alternate hypothesis of innocence unreasonable.[6]

The trial court, sitting as fact finder, "determines which reasonable inferences should be drawn from the evidence, and whether to reject as unreasonable the hypotheses of innocence advanced by a defendant." *Moseley*, 293 Va. at 464. Appellant has failed to show that the trial court's rejection of her alternative hypotheses of innocence was "plainly wrong." *Wood*, 57

---

[6] In addition, we note that the evidence in this case is strengthened by a fact not present in either *Jones* or *Bennett*—here, an exchange of money between appellant and Gale was acknowledged by appellant during the audio recording.

Va. App. at 306.  Therefore, we conclude that the trial court did not err in convicting her of the charged offense.[7]

III.  CONCLUSION

For the reasons stated above, the trial court did not err in convicting appellant of distribution of a Schedule I or II controlled substance.  Accordingly, we affirm the judgment of the trial court.

<em>Affirmed.</em>

---

[7] We acknowledge that, as noted above, in circumstantial evidence cases, the Commonwealth must establish "an unbroken evidentiary chain of necessary circumstances" to prove the defendant's guilt beyond a reasonable doubt.  *Moseley*, 293 Va. at 463.  However, this language does not mean that the circumstantial evidence here is insufficient because Monaghan lost sight of Gale while Gale was in appellant's home or because other individuals can be heard on the audio recording of the controlled buy.  Those particular facts do not "break" the chain of circumstantial evidence linking appellant to the offense in this case.  Our case law is clear on this—if circumstances indicating that persons other than the defendant were present during a controlled buy meant that the evidentiary chain was "broken," then our Court would have had to reverse the convictions in *Jones* and *Bennett*.  Instead, properly viewed, the fact finders in *Jones* and *Bennett*, as well as the trial court here, were allowed to view the evidence in its entirety and determine whether the defendant's alternate hypothesis of innocence was reasonable in light of all the circumstances presented to the court.

Reviewing the Commonwealth's evidence, we find that it clearly established an unbroken chain linking appellant to the distribution of oxymorphone to Gale.  Each piece of circumstantial evidence described above provided a circumstance upon circumstance from which the fact finder could rationally conclude that appellant sold the pills to Gale.  "While no single piece of [circumstantial] evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'"  *Ervin v. Commonwealth*, 57 Va. App. 495, 505 (2011) (en banc) (alteration in original) (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)).

- 15 -

Chaney, J., with whom Causey, J., joins, dissenting.

The trial court convicted appellant, Teresa Maust (defendant), of distributing three oxymorphone pills to a police informant, although the evidence was insufficient to support a finding that defendant distributed the pills that police obtained from the informant. Considering the totality of the evidence and all reasonable inferences therefrom in the light most favorable to the Commonwealth, substantial gaps in the chain of evidence render the wholly circumstantial evidence insufficient for any rational fact-finder to find beyond a reasonable doubt that defendant, and not some other person, distributed the oxymorphone pills recovered from the informant. Therefore, we respectfully dissent from the majority's opinion affirming defendant's conviction for distribution of a Schedule II controlled substance in violation of Code § 18.2-248.

## BACKGROUND

On October 1, 2018, Detective Monaghan obtained three oxymorphone pills from a paid police informant who died before trial, making him unavailable to testify.[8] Consequently, there was no eyewitness testimony about the informant's interaction with defendant on the alleged offense date. The police did not observe the informant's interaction with defendant, and there was no video recording of their interaction. The police had no live audio feed of the informant's activities and communications with defendant. The only evidence of the informant's interaction with defendant on the date of the alleged offense, October 1, is a poor-quality audio recording from the recording device that police wired to the informant. The detective testified that parts of the audio recording recovered from the informant sounded "very garbled." At various points while the recording was played at trial, the trial court observed that nothing intelligible could be heard.

---

[8] The informant had previously acted as a police informant to "work off charges." Here, the police were paying the informant. When he worked for money, the police usually paid the informant $100 per investigation.

- 16 -

Before the informant drove to defendant's house on October 1, the detective met with the informant to provide him with the recording device and $320. Before giving the money to the informant, the detective recorded each bill's denomination and serial number. The detective gave the informant $300 to buy three oxymorphone pills and an additional $20 to repay a $16 debt the informant claimed he owed defendant. To ensure that any drugs eventually recovered from the informant were obtained from defendant and not another source, the detective (i) searched the informant's person and vehicle before the informant drove to defendant's house, (ii) wired the informant with an audio recording device, and (iii) followed the informant's vehicle most of the way to and from defendant's house.

The informant was a drug addict and a convicted felon with a lengthy criminal record. The detective instructed the informant to drive to defendant's house and purchase oxymorphone pills with "buy money" from the sheriff's department.

The audio recording recovered from the informant demonstrated that an unidentified person was in the informant's vehicle conversing with him during his drive to and from defendant's house. There is no evidence that the police ever searched the informant's driving companion, and no evidence that the police were even aware of the presence of the informant's driving companion during the "controlled buy."

When the detective followed the informant's vehicle to defendant's house, he lost sight of the informant after the informant drove up defendant's driveway. The detective could not see the informant's vehicle at the end of the driveway, nor could he see the informant enter or exit defendant's house. Other vehicles were parked in defendant's driveway while the informant was at defendant's house. The detective testified that he did not know how many people were in defendant's house while the informant was there on October 1, 2018. The informant's audio recording demonstrated that at least two persons other than defendant were present in defendant's

house while the informant was there, and at least one of them communicated with the informant. The recording also indicates that before the informant drove away from defendant's house, he was out of defendant's presence for a continuous period of approximately two minutes. The evidence does not establish the whereabouts of the informant's driving companion during the approximate ten-minute period when the informant was inside defendant's house.

After the informant and defendant exchanged greetings, following some static and unintelligible communications on the audio recording, the informant exchanged greetings with an unidentified male. The recorded conversation between the informant and defendant promptly turned to the subject of appliances that defendant was selling. Then the informant briefly went outside to his vehicle to retrieve the money he left there. When the informant returned, he stated that he owed defendant $14 and asked if she had change. He gave defendant some money and after they both commented on the "old style" of the bills, defendant said "two forty and four." Then they resumed the conversation about appliances, and the informant asked to see the stove and refrigerator. The informant also stated that his current stove wasn't working properly.

As the informant is heard moving to the location of the appliances, he greeted another unidentified person. After additional conversation about the appliances, the informant took pictures of them. As the informant was taking pictures, defendant stated, "I owe you six bucks, right? You owe me two fifty four." The informant replied, "Sixteen." Defendant responded, "Two fifty four. And you gave me two seventy." A moment later, defendant said, "Let me get change." Defendant made some additional remarks about the worth of the appliances and then said, "Give me a second." The informant replied that he would be outside. While the informant was near the appliances, the sound of an unidentified woman talking was twice recorded.

The next communication between defendant and the informant was about two minutes later. During the intervening two minutes, the informant was recorded moving outside and then talking.

Some other unidentifiable sounds of movement were also recorded. When defendant returned with the informant's change, the informant told defendant that both his mother and sister may also be interested in the appliances.

After the informant left defendant's house, he and the detective separately drove back to the same commuter lot where they had met earlier that day. The detective retrieved the audio recording device and again searched the informant's person and vehicle. The informant did not have any of the buy money, but he did have $16 in cash which was not part of the buy money—the same amount that the informant stated he was owed in change after giving defendant $270. The informant also turned over three pills that were subsequently found to contain oxymorphone, a Schedule II controlled substance.

The next day, on October 2, 2018, the detective executed a search warrant at defendant's house. The police found numerous pills, a pill press or pill crusher, and "numerous prescription bottles for different narcotics, the majority of which were empty." Some pills that were found were prescribed to defendant, and others were prescribed to her female tenant.

While the search of defendant's house was underway, defendant arrived home with her female tenant. Defendant gave the detective the combination to a safe that was found in her bedroom. Defendant told the detective that some money in the safe may have been money that the informant had borrowed and repaid to her.

When the detective interviewed defendant during the search, defendant stated that the residents of her house included herself, her two adult sons, and her female tenant. Defendant initially denied any involvement in narcotics dealing. Defendant told the detective that she had legitimate prescriptions for an injury. Defendant stated that her ex-husband would steal and sell her prescribed pills, but she acknowledged that her ex-husband had moved out the month before. Defendant admitted that sometimes she lends pills to her friends if they run out, but she denied

selling pills.  The detective informed defendant that such distribution of controlled substances is also illegal.  In response to the detective's statement that "we purchased these pills," defendant replied that any money she received from the informant was for payment of a debt.  Defendant stated, "I don't know why you're bothering me, he's a way bigger dealer than I am."

The police found $4,351 in the safe, including $270 of the buy money that the detective gave the informant.  The detective testified that "there was sixteen one hundred dollar bills, there were twenty-seven fifty dollar bills, there were fifty-nine twenty dollar bills, there were eighteen ten dollar bills, there were [eight five] dollar bills, and there was one one dollar bill which totaled up to four thousand, three hundred and fifty-one."  The police found an additional $138 elsewhere in defendant's bedroom.

All the money in the safe was inside an envelope with writing on it that included the following notations,[9] arranged in two columns:

$$\begin{array}{ll} B = 11 & 1100 \\ G = 17 & 850 \\ J\ = 121 & 2420 \\ H = 25 & 250 \\ L = 19 & \underline{\ \ 95} \\ & 4710 \end{array}$$

The detective characterized the writing on the envelope as an "owe sheet" used to keep track of drugs given out on credit.  The detective also testified that the numbers next to the letters could represent pills or money.  Defendant testified that the writings on the envelope were a record of her prior count of the money in the envelope.  Defendant explained that each letter represented the denomination of the bills, e.g., "B" for Benjamin, "H" for Hamilton, and "L" for Lincoln.  Defendant testified that the second column was the tally of the money.  When defendant's counsel attempted to argue that the initials on the purported owe sheet represent denominations

---

[9] On Commonwealth's Exhibit 3, the top portion of the first number in the second column is obscured by an evidence sticker, but the number appears to be "1100."

of United States currency, the trial court interrupted her closing argument stating, "Ms. Coleman, nobody does that."[10] This finding followed the detective's testimony showing that the detective counted the money from the safe by counting the number of bills in each denomination and adding these amounts together to determine the total amount.

Applying elementary arithmetic to the information in the above table, 11 "Benjamins," i.e., 11 one-hundred-dollar bills, amounts to $1100, as stated on the first line in the second column; 17 "Grants," i.e., 17 fifty-dollar bills, amounts to $850, as stated on the second line in the second column; 121 "Jacksons," i.e., 121 twenty-dollar bills, amounts to $2,420, as stated on the third line in the second column; 25 "Hamiltons," i.e., 25 ten-dollar bills, amounts to $250, as stated on the fourth line in the second column; and 19 "Lincolns," i.e., 19 five-dollar bills, amounts to $95, as stated on line five in the second column. When the numbers in the second

---

[10] The trial court unreasonably rejected defendant's explanation that the writing on the envelope containing cash was a recorded count of money by currency denominations, not an "owe sheet." First, it is highly unlikely that individuals on the purported "owe sheet" would have identifying initials coinciding exactly with the first letters of the "nicknames" of currency denominations: B, J, G, H, and L. In addition to it being highly improbable that B, J, G, H, and L are the initials of five individuals chosen at random, it is even more unlikely that those five individuals would owe amounts that correspond precisely with multiples of the currency denomination identified by their initial. As can be confirmed by simple counting and use of elementary arithmetic, only 1 in 5 numbers are multiples of 5; only 1 in 10 numbers are multiples of 10; only 1 in 20 numbers are multiples of 20; only 1 in 50 numbers are multiples of 50; and only 1 in 100 numbers are multiples of 100. It is extremely unlikely that the amounts owed by all five individuals would be exact multiples of the currency denomination corresponding to their initial. In contrast, the hypothesis of innocence that the notations are a recorded count of cash money by currency denominations is a complete explanation of the letters and corresponding numbers on the envelope.

Because it is so highly improbable that the notations on the envelope are an "owe sheet" and not a recorded count of money by currency denominations, the trial court erred by arbitrarily rejecting defendant's innocent explanation of the notations. *See Wright v. Commonwealth*, 292 Va. 386, 397 (2016) ("[W]here a fact is equally susceptible of two interpretations one of which is consistent with the innocence of the accused, [the trier of fact] cannot arbitrarily adopt that interpretation which incriminates [the accused]." (alterations in original) (quoting *Commonwealth v. Smith*, 259 Va. 780, 782 (2000))).

column are added together, the sum is 4,715, approximately the same as the number on the sixth line in the second column beneath the horizontal line, i.e., 4710.

Defendant testified that on October 1, 2018, the informant came to her house to look at appliances that she was selling and to give her "a down payment for a pancake compressor and a framing nail gun." Defendant also testified that the informant paid her back around $150 that he had borrowed.

ANALYSIS

Considering the totality of the evidence, the evidence is insufficient to sustain the conviction for drug distribution because no rational fact-finder can find beyond a reasonable doubt that the wholly circumstantial evidence formed an unbroken chain of necessary circumstances linking defendant to the crime of distributing the three oxymorphone pills recovered from the informant. In other words, the evidence as a whole failed to exclude the reasonable hypothesis of innocence that the informant obtained the oxymorphone pills from someone other than defendant. According to our Supreme Court's longstanding precedent,

> Where the evidence is entirely circumstantial, all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and must exclude every reasonable hypothesis of innocence. The chain of necessary circumstances must be unbroken. The circumstances of motive, time, place, means and conduct must all concur to form an unbroken chain which links the defendant to the crime beyond a reasonable doubt.

*Brown v. Commonwealth*, 238 Va. 213, 220 (1989) (quoting *Bishop v. Commonwealth*, 227 Va. 164, 169 (1984)). "While a conviction may properly be based upon circumstantial evidence, suspicion or even probability of guilt is not sufficient." *Gordon v. Commonwealth*, 212 Va. 298, 300 (1971). "[E]vidence that raises no more than a suspicion of guilt 'no matter how strong, is insufficient to sustain a criminal conviction.'" *Wright v. Commonwealth*, 292 Va. 386, 397 (2016) (quoting *Stover v. Commonwealth*, 222 Va. 618, 624 (1981)). Proof of a mere opportunity to

commit an offense provides only "the suspicion that the defendant may have been the guilty agent; and suspicion is never enough to sustain a conviction." *Simmons v. Commonwealth*, 208 Va. 778, 783 (1968).

Here, substantial gaps in the chain of evidence preclude a finding by a rational fact-finder that defendant distributed the three oxymorphone pills recovered from the informant. A fatal gap in the chain of necessary circumstances exists because the informant's acquisition of the oxymorphone pills was not "controlled" by the detective. The unexplained presence of the informant's unsearched driving companion defeated the detective's purpose in searching the informant and his vehicle before he met with defendant. Given this break in the chain of necessary circumstances, a rational fact-finder cannot find beyond a reasonable doubt that defendant distributed the drugs recovered from the informant.

Additional gaps in the chain of evidence were created by the gaps in audio surveillance due to the poor quality of the audio recording recovered from the informant. As the detective testified, parts of the recorded audio were "very garbled" due to static or other issues. As the trial court observed, some parts of the recorded audio emitted no sound.

Another fatal gap in the chain of circumstances necessary to prove defendant's criminal agency relates to the informant's unmonitored access to two persons other than defendant when the informant was inside defendant's house. The informant's recording device recorded the voices of two persons other than defendant inside defendant's house. A male voice was recorded exchanging greetings with the informant. A female voice was twice recorded in the informant's company just before the informant announced that he would wait for defendant outside. Additionally, the informant's recording had several unintelligible garbled segments, creating gaps in the audio surveillance. Based on the totality of evidence, a rational fact-finder could not find that the informant "could not have obtained the [controlled substance] from a source other than the

defendant." *Jones v. Commonwealth*, 21 Va. App. 435, 443 (1995) (en banc) (affirming conviction for drug distribution to a police informant where the circumstantial evidence did not establish that the informant had access to someone other than defendant at the time of the controlled drug buy). Given the informant's access to persons other than defendant between the time the detective initially searched the informant and the time the detective recovered the drugs from the informant, there is a fatal break in the chain of circumstances necessary to support a finding that defendant, and not someone else, distributed the drugs recovered from the informant. Because the informant's drug acquisition was not "controlled," a rational fact-finder's consideration of the totality of the evidence precludes a finding beyond a reasonable doubt that defendant distributed the oxymorphone pills in evidence.

Additional evidence of the uncontrolled nature of the informant's activities is the discrepancy between the amount of money that the detective recovered from the informant and the amount of money that the informant should have returned to the detective. According to the recorded conversation between the informant and defendant, (i) the informant owed defendant money, (ii) the informant gave defendant $270, and (iii) defendant gave the informant $16 in change. The detective found the $270 that the informant gave defendant in defendant's safe. The detective recovered $16 from the informant that was not from the set of dollar bills that the detective gave the informant. Given that the detective gave the informant $320 and the informant paid defendant $254, the informant should have returned $66 to the detective. But after searching the informant and his vehicle, the detective recovered only $16. The evidence demonstrates that during the purportedly controlled buy, the informant was able to conceal or transfer $50 without notice by the detective. Given this, no rational fact-finder could find from the evidence that the informant could not have retrieved the three oxymorphone pills from somewhere or obtained them from someone other than defendant. *See id.* (affirming drug distribution conviction based on

circumstantial evidence of criminal agency because the evidence supported a finding that the informant "could not have obtained the [controlled substance] from a source other than the defendant").

Although the undisputed evidence supports the trial court's finding that defendant "engaged in some kind of financial transaction," the evidence is insufficient to support a finding that this was a drug transaction. In holding otherwise, the majority mistakes speculative suspicion for reasonable inference. The only evidence that defendant gave the informant something after receiving $270 from him is the evidence that she gave him $16. On the informant's audio recording, defendant stated that the informant owed her $254 and the informant stated that she owed him $16 back after he gave her $270. The totality of the evidence does not support a finding beyond a reasonable doubt that this was a drug transaction.

Even if the evidence supports a finding that defendant was a drug dealer, fatal gaps in the chain of evidence preclude a rational fact-finder from finding beyond a reasonable doubt that defendant distributed the three oxymorphone pills recovered from the informant. Defendant was not on trial for being a drug dealer, but for distributing the oxymorphone pills recovered from the informant on October 1, 2018. Proof that a defendant is a drug dealer is insufficient to support an inference that the defendant sold drugs to a particular individual on a specific date as charged. The totality of the evidence is insufficient to prove defendant's criminal agency with respect to the charged distribution offense given the substantial gaps in the chain of circumstances necessary for such proof. Taking all the evidence in the light most favorable to the Commonwealth, the evidence does not point unerringly to defendant as the source of the pills recovered from the informant. Considered as a whole, the evidence creates no more than mere suspicion or probability of defendant's guilt. "[T]o sustain a criminal conviction, the Commonwealth is required to prove more than a suspicion of guilt or probability of guilt."

*McMorris v. Commonwealth*, 276 Va. 500, 506 (2008).  Under this standard, the conviction should be reversed.

CONCLUSION

The totality of the evidence does not form an unbroken chain of circumstances necessary for a rational fact-finder to find beyond a reasonable doubt that defendant—and not someone else—distributed the oxymorphone pills recovered from the informant.  Therefore, we respectfully dissent from the judgment affirming the conviction for distribution of a Schedule II controlled substance.